In the Matter of the Estate of CHARLES O. OBERG, Deceased.

Surrogate's Court, Monroe County, July 10, 1933.

*Mann, Strang, Bodine & Wright* [*E. W. Gumaer* of counsel], for the petitioners.

*Hubbell, Taylor, Goodwin, Nixon & Hargrave* [*A. W. Dunbar* of counsel], for the executor.

FEELY, S. Testator was indebted on promissory notes in the sum of $176,900. The payee was a banking corporation that was also empowered to act as a trust company. As collateral to these notes, testator delivered to the payee certain securities of the value of $372,616. These did not comprise his entire estate. Shortly after his death, the payee corporation, under its trust powers, qualified as the nominated executor and trustee of the pledgor's estate, early in September, 1931, and as such executor took into its trust department all of the testator's estate and its securities, both pledged and unpledged. The trust officer immediately wrote the attorney of

record for the estate, who had drawn the will, and had acted as counsel to the testator and his family, the following letter: " Upon a review of the securities held in this estate, our Trust Committee asked me to obtain from your office an opinion as to the rights and obligations of the Trust Company as Executor in connection with the liquidation or continuance of the collateral loan which is in the sum of $176,900, and which loan is at the Lincoln Branch of the Lincoln-Alliance Bank and Trust Company. We have communicated with the Lincoln Office, and the Banking Department is perfectly willing to continue the loan for such time as may be desired by the Executor.

" We are enclosing a list of the securities which are now held as collateral under this loan. We should like to have a written opinion from you as to our obligation to liquidate this loan, and if your opinion is that the loan should be liquidated, how long a period of time the Executor could reasonably have in order to carry out the same.

" At the same time it would be helpful to us if a memorandum could be prepared concerning the rights and liabilities of an executor and trustee to continue to hold common stocks where they comprise almost one hundred per cent of the estate, with particular reference to the fact that a considerable loan is in existence against a large portion of the securities."

Within a week the attorney for the legatees replied, so far as is pertinent to the present inquiry, that " The fact that the Executor is also a creditor and is willing to continue its loan does not  *  *  * affect the duty of the executor to pay the debt.  *  *  *  and that  *  *  *  the obligation should be discharged within a year.  *  *  *

" As to the particular time and price at which the collateral should be sold, and as to which items of the collateral should be first sold, the law, in my opinion, gives the executor a wide discretion.  *  *  * It would seem to me that your Committee should act as though the Bank itself were the owner of this collateral, faced with the duty of realizing upon it within a year a sum of money sufficient to discharge the debt.  *  *  *

" Coming now to the question raised in the final paragraph of your letter, relating to the right of an executor and trustee to continue to hold common stocks where they comprise almost 100% of an estate: I would say that, as a matter of law, under the terms of this will, you have the right to continue to hold the best of these stocks. I assume that in liquidating the demand loan, you will first sell those which you consider least adapted for investment, which will

leave in your hands those which you consider the best common stocks which Mr. Oberg owned. * * *

" Ordinarily, I think we would all agree that it would be better investment policy to have a considerable portion of this fund invested in bonds and preferred stocks, rather than all in common stocks. When, if and to what extent that should be done, particularly under existing conditions, is a matter as to which the law lays down no hard and fast rule, but which should engage the best investment talent at your command."

Pursuant to this correspondence between the executor and the family attorney, and in order to facilitate the marketing of the less desirable securities generally, as planned, the bank had the pledged securities moved over from its banking department at the Lincoln office to its trust department at the main or Lincoln-Alliance office, where the unpledged securities of this estate were in the corporation's possession as executor. The executor, in effect, thus became possessed of all of testator's securities, both pledged and unpledged. Up to the time of this transfer, the pledged securities, with the usual stock powers attached, stood in the name of the deceased pledgor; and the early dividends thereon, received after his death, came in the form of checks to his order, which were turned over to the trust department of the executor, and appear as charges in its executorial account herein; and so do later dividend checks which came to the same order, but with the addition, " c/o Trust Department, Lincoln Alliance Bank and Trust Company," the corporate executor. None of these dividends were credited on the notes by the banking department of the corporation.

The executor then began to sell. All selections for sale, and all sales were made by the executor; and it indorsed the certificates as executor. The stock powers were not used. Not all of the collateral was sold. About three-quarters of the debt, or $129,930.60, was paid from proceeds of sale on securities that had been pledged. The remaining quarter of the debt, or about $46,069.40, was paid from the proceeds of estate securities that had not been pledged by testator. The latter were so used and applied, especially a portion of the Kodak stock, under the direction of the attorney for the parties in interest. There resulted thus a general culling of all the estate securities, both pledged and unpledged, that over all was advantageous to the estate. The bank, as pledgee, did not, under the stock powers, selfishly realize at any current market on such of the collateral as it alone might choose to select, and turn any balance over to the executor account; but acting in its capacity as executor, having the family interests also in view and after the foregoing correspondence with the attorney for the legatees, the

bank through its trust department sold such securities as were selected from the pledged and from the unpledged holdings so as to leave on hand only " the best common stocks " which testator owned. Upon satisfaction of the notes from the proceeds of such operation, the unsold portion of the collateral pledged, corresponding to the portion culled from the estate's unpledged securities, or about $48,069.40, became the free and clear property of the estate.

Now, upon judicial settlement of the corporation's account as executor, in preparation for setting up certain trusts to be carried by it as testamentary trustee, this court is asked to say how the executor may compute its commissions, if any, with respect to the value of the pledged securities to the extent of the note, or $176,900, notwithstanding only $129,930.60 worth of pledged securities were actually sold, the other $48,069.40 having been salvaged by sale of a corresponding amount of unpledged securities. The question will be considered generally, without regard to this latter item, for several reasons. The corporation's powers as executor were greater than its powers as pledgee, and different in quality. The executor, without authority from non-specific legatees, might have used such estate securities as he thought of comparatively lower grade, for the purpose of redeeming pledged securities of better quality. This $48,069.40 in pledged, but unsold securities, the corporation took over from itself as pledgee on the same basis and understanding as it did the rest of the pledged and unpledged securities. Had there been a physical separation of the pledgee from the executor — that is to say, had this petitioning bank and trust company as executor taken over from a separate and distinct banking company some estate securities the latter was holding under a pledge made to it by testator in his lifetime to secure a loan, and had this taking over been agreed upon by and among the two companies and the family, in the circumstances of this case — I dare say the accounting trust company would be held entitled to recompense for having " received and paid out " both the pledged and the unpledged securities. (*York* v. *Maryland Trust Co.*, 150 Md. 354; 46 A. L. R. 231, and hereinafter summarized.) A conspicuous but unimportant feature of the case in hand seems to be the fact that one and the same corporation appears in two distinct roles in this picture, first that of pledgee, and then that of executor; but another peculiarity, of much more importance, is the part played by the family in the transaction.

Examination of the various cases cited leads to the conclusion that the difficulty lies, not so much in the rule of law itself, as it does in applying the rule to the particular facts of each case, in the complexity of modern methods of ownership and exchange, with all its symbols and short-cuts, and with the artificial bodies of persons,

known as corporations, mingling with natural persons. The seemingly divergent cases, however, show that what have been held factors of importance have been held to have had an equitable importance rather than a technical one. Our point, then, is whether the present is a case merely of one's left hand making a technical shift of some property over to one's right hand, as in *Farmers' Loan & Trust Co.* v. *Turner* (242 N. Y. 240), where the executor was also a mortgagee, or whether, from the equity viewpoint, the pooling of the pledged with the unpledged securities in the hands of the executor for general culling by the latter, especially, with family authorization and participation, this case should be considered not to be any different from the case mentioned above, where one corporation was the pledgee, and another was the executor engaged in a similar undertaking of selection and sale of the culls generally. (*York* v. *Maryland Trust Co., supra.*)

As for the general rule itself, there is no doubt that for years the steady policy of our courts, in construing various substantially similar statutes declaring a decedent's representatives, or any trustee, or an assignee for creditors, or a receiver, should be compensated by a percentage of the money or value of their " principal " which they handled in their work as such, has been to base the computation only on so much of his money or property as was actually handled. For the purposes of the present inquiry, the cases may be conveniently grouped according to where the emphasis seems to fall, sometimes more on one aspect that on another. First, there are the cases which emphasize that the property handled was not wholly the decedent's own property, as where others had an undivided interest therein, by mortgage, pledge, or lien, etc. In the second group, the question seems to have been, not so much whether decedent was or was not sole owner, as it was whether there had been an actual handling of whatever he had. The third group comprises cases in which a special agency seems to have been conferred on the representative as the result of the family or parties in interest intervening in, and changing the course of, his handling and management. This, however, may be but a special variety of actual handling, and belong really in the second group.

In the first group, although the combination of undivided interests in the same piece of property may make it necessary for the representative of one to handle it all in order to get out of it his decedent's interest, still the only real interest the decedent had therein was his " equity," or net rights in the land mortgaged or the stocks pledged for debt; and, generally speaking, the rule here has been to limit the commission to the value of such equity. (*Matter of Horner*, 126

Misc. 772; *Matter of Foster*, N. Y. L. J. Apr. 13, 1933; *Matter of Mills*, 149 Misc. 389.)

The term " pledge," however, does not strictly apply to the case where the decedent had a " margin " account with a stockbroker, whereby the broker is obligated to deliver to the customer so much stock of a certain kind, which, according to the custom of such trading, the broker need not have on hand until the necessity of actual delivery arises to compel him to buy, or " borrow," the requisite amount of such stock for delivery to the customer. (*Matter of Mercantile Trust Co.*, 210 N. Y. 83.) The broker in such cases is loosely said to " hold " the stock for the customer's account, but the fact that this may be a mere obligation so to do, without any actual possession or delivery, distinguishes the case from the present one where this decedent owned and had possession of the securities he delivered to the bank as collateral security.

Where the decedent's property is subject to incumbrance and is " sold subject," and the representative receives only the net amount, his commissions are limited to the actual net receipt. (*Baucus* v. *Stover*, 24 Hun, 109.) If, however, the representative actually receives the whole purchase price, and by his own check pays off the incumbrance, he is entitled to figure his commission on the whole purchase price. (*Matter of Security Life Insurance & Annuity Co.*, 31 Hun, 36, 39; *Matter of Price*, 13 Penn. Dist. Rep. 129.) In this *Price* case mortgages made by testator to secure his own bonds were paid from the purchase money, and the executors were allowed commissions on the whole selling price. When the mortgaged land is taken back on foreclosure, commissions are figured on its full value. (*Matter of Ross*, 33 Misc. 163; *Phœnix* v. *Livingston*, 101 N. Y. 451.) So, where the executor was responsible for the whole value of the property and so charges himself in his account, his commission is figured on the whole, according to the ruling in *Cox* v. *Schermerhorn* (18 Hun, 16), as interpreted by Judge HARDIN in *Matter of Fulton* (30 Hun, 258). The facts are scantily reported in the original citation. In such cases of sale subject to incumbrances, the fact that the representative in his account charges himself only with the net amount he received, has been regarded as an admission against interest, which tended to preclude him from claiming commissions on the whole. (*Moffett* v. *Eames*, 143 N. Y. Supp. 357; affd., 166 App. Div. 898; 216 N. Y. 708.)

In the second group of cases, one finds that not all actual handling has been recompensed; that mere theoretical handling has gone unrewarded. Obviously, to compute on mere bookkeeping entries of sums that had been only theoretically handled could lead, in some cases, to the unjust result given as an illustration in *Hitchcock*

v. *Mosher* (106 Mo. 578; 46 A. L. R. 239), where the court presented this supposition, in reference to a statute allowing five per cent commission on personal property and " on money arising from the sale of real estate:" " If a decedent leave personal property worth $200,000, pledged to secure a debt of $190,000, and it is sold by the pledgee, and realizes enough to pay the debt and leave a surplus of $10,000, which is paid to the administrator, evidently the statute does not mean that the administrator is entitled to retain the $10,000 for his commission on the $200,000."

The court adds: " By charging himself with the gross amount of sales of stock and taking credit by the amount retained by [the brokers] an appearance is given of having administered upon an estate of a value in excess of the estate actually administered upon, to the extent of that credit, but it is an apparition only. We think the circuit court did right in disallowing commission on a value which never had an existence for the beneficiaries of the estate, or at all, save in the account of the administrator, where it appears for an instant on the debit, only to vanish in the same instant on the credit, side of the account; it is an estate too ghostly and impalpable to bear the burden of such commission."

To the same effect is the ruling in *Farmers Loan & Trust Co.* v. *Turner* (242 N. Y. 240). The same element of actual value to the beneficiaries is emphasized in *Matter of Dean* (86 N. Y. 398), where it was said that an assignee's " commissions upon the $1 received by him for such property, which was all the value thereof to the trust estate, give him all he was entitled to."

I venture to say here that just as a mere bookkeeping charge could not create an actual receipt where there never had been one in fact, so an actual receipt, or one that was actual " in contemplation of law," would be none the less actual because the executor in disposing of it adopted some short cut in exchange or in bookkeeping. (See *Huddleston* v. *Kempner*, 87 Tex. 372.) In that case and *Matter of Pease* (149 Cal. 167) the representative sold land under court order, and the purchaser, having a lien thereon, tendered a release as part of his bid; and in the latter case had made claim on the bond against the estate. In the *Wolf Case* (36 Tex. Civ. App. 168) the administrator, selling land for debts, settled with the purchaser by receiving in lieu of so much cash on his bid notes the bidder held against the decedent, secured by mortgage on the land. In the *Huddleston* v. *Kempner Case* (*supra*) the court said it would be a narrow construction of the statute to hold that because the administrator did not demand delivery of money in the full amount of the bid that, therefore, he did not receive and pay out that for which he was responsible as received and paid out; and that had all

the money been delivered, part of it would have been at once returned to the bidder, just as if another person had bid on the land the lien would have been paid at once; and that it was simply a favor granted by the administrator to the lienor bidder in not putting the latter to the inconvenience of bringing in all the money.

The requirement that the handling should have been " actual " is shown in the case of a receiver of a business who turned over the whole actual handling of it to two interested persons, who made a success of their work. When the wind up came, the company property was sold at auction. The court auditing the receiver's account held that the receiver's commission " on the amount received and disbursed " was limited to the proceeds of the sale; and not to be on the money received and disbursed by the two managers in the conduct of the business. " It cannot be claimed that he either received or disbursed the moneys which never came into his possession, and over which he exercised no personal control." (*Matter of Woven Tape Skirt Co.*, 85 N. Y. 506.) So, in *Matter of Smith Co.* (31 App. Div. 39) the court said that a temporary receiver's commission " should have been exceedingly moderate, in view of the fact that the receiver employed many persons to assist him at considerable, and as it is claimed, somewhat unnecessary, expense to the estate. His own labors were unquestionably slight and his responsibilities by no means great." However, besides the element of judicial discretion, there is `in such cases also the rule that commissions shall not go beyond capital and its natural increase or profit; that is to say, they are not computed on gross turn-over, although this includes moneys actually handled. Thus, in *Matter of Sidenberg* (204 App. Div. 255) part of a trust estate consisted of a hotel, and the basis of the trustee's commissions was held to be, not the gross income derived from its operation, including mere turn-over of receipts and disbursements, but to be the net income which came to the corpus of the estate as an increase thereof, where it had been run at a profit. (See *Beard* v. *Beard*, 140 N. Y. 260.) Were commissions figured otherwise, the Appellate Division said, the case might occur where they would exceed the whole of the original corpus and its increment. Another court has expressed the same rule by saying that if mere turn-over were included, the representative would " receive double commissions upon the same sums of money passing into his hands." (*Matter of Security Life Insurance & Annuity Co.*, 31 Hun, 36, 39.) This last mentioned formula did not apply to the particular situation in *Matter of Hopkins* (226 App. Div. 180), because there the will directed the executors to pay off and discharge a certain mortgage, and they did so. Thereafter they sold the same land; and their commissions

were allowed both on the amount paid to discharge the mortgage, and also on the price received for the land, for no part of the proceeds of the sale were used to pay the mortgage debt; and the payment to discharge the mortgage, under the direction of the will, cannot be considered a mere change in investment. The executors did actually and in fact receive and pay out the amount of the mortgage.

The third group comprises cases where the parties in interest frustrated potential handling of the property by the representative, or modified his course, or acquiesced in his deviation. The result of intervention by the parties in interest, where it changes the general course for a representative, or the result of their acquiescence in his actual course or deviation, seems to be the creation of a special agency that the parties are held bound to recompense. This is the opposite of the case where the executor could have used a power of sale, but did not do so (*Matter of Salomon*, 252 N. Y. 381), or had not yet done so, as regards transfer tax computations (*Matter of Seiss*, 119 Misc. 521), especially where the will did not work an equitable conversion (*Matter of Hardenbrook*, 23 Misc. 538; *Matter of Greer*, 123 id. 909), and much more so the land was willed directly to the devisee. (*Matter of Rhodes*, 109 Misc. 406; *Matter of Brown*, 5 Dem. 223; *Matter of McGurk*, 175 N. Y. Supp. 597; *Matter of McGlynn*, 41 Misc. 156.)

Where, however, an executor who could have sold was ordered by the legatees not to do so, he did not lose his commissions. Thus, in *Matter of Kennedy* (133 Misc. 904) half the land was devised directly to a niece, and the other half to four other persons. The executor had a power of sale. All the legatees and devisees united in a written notice to the executor they desired to take the property in kind; and having fixed values, they further agreed the niece should have all the land, and the personalty was to be divided among the others. The executor effectuated their plan; and he was held to be entitled to " commissions upon the real estate which he otherwise had a right to sell, and the proceeds of which it would have become his duty, if he had chosen to sell, to distribute among the devisees and legatees." It has also been held that the mere fact the beneficiaries executed deeds confirmatory of conveyances the executors had made under a power, did not take off from the executors' right to commissions. (*Matter of Prentice*, 25 App. Div. 209; affd., 160 N. Y. 568.)

So, in *Smith* v. *Buchanan* ([1886] 5 Dem. 169) the will gave the residuary estate to the executors, in trust, to convert the same into money and ultimately divide all among testator's children. The executors, however, after considerable negotiation, conveyed most of the fifteen parcels of land to the children, at agreed valuations,

and took receipts for the purchase price, and applied the amounts upon the distributive shares of the grantees. At the time of this decision, the right to commissions on land depended upon its having been equitably converted by the testator in the plan of his will. There, the surrogate said: " The sales and conveyances of real estate to the children, the acceptance of the purchase price and receipting therefor as a portion of their share of the estate of the father, was, in legal effect and in substance, a sale and conveyance of such real estate, and the same as if the purchaser had paid to the executors the purchase money and the executors had immediately repaid it as so much on the portion of the purchaser." The relation of an executor to a doweress affords another illustration. In *Matter of Isaacs* (30 Cal. 105) the executor, without any authority whatever in the law, but apparently under orders from the family, set apart, out of the general assets, $5,000 to the widow in lieu of a homestead. The only objection to his having done so was to his claim for commissions thereon; but the court held he was entitled thereto. In *Matter of Lawrence* (37 Misc. 702) it was held that after a widow's dower had been admeasured by judgment, the payment to her, by the executor of her deceased husband, of the amount so admeasured was not a payment in the discharge of an executorial duty. He did so, apparently, without authority from the heirs, or any direction so to do contained in the will. (See *Matter of Green*, 168 N. Y. Supp. 728.) It seems fair to infer that had the heirs, in order to free their land from actual occupancy by the widow under the allotment, directed the executor to pay her the amount admeasured, provided she accept it in lieu of the allotment, that then the executor, in that particular undertaking, would have become the private or special agent of the heirs, and entitled to commissions on the amount so paid out for them.

The creation of some such particular agency by the act of the executor alone, without express family participation — or rather the emergence of that particular power as an implication of the executor's duty to pursue and preserve the assets, regardless of the family wishes — seems to characterize the case, much relied upon by this executor, of *Matter of Bolles* (67 Misc. 40); and also the case of *York* v. *Maryland Trust Co.* (150 Md. 354; 46 A. L. R. 234). In the latter the corporate executor's trust officer found testator's stocks in Cleveland and in New York, in the hands of bankers as pledgees, segregated from their general assets and earmarked; and he " then arranged to have the stocks sold as and when he directed. * * *

" These stocks were then sold by the bankers who held them, not at their own discretion; but at the direction of the executor; and these sales were reported to the orphan's court as having been

made by it; and that, after about $600,000 had been paid to [the bankers pledgees], the executor itself advanced about $120,000 for the payment of certain balances due these and other bankers, and took up and sold the stocks as collateral for these balances. * * *

" The executor did pursue the decedent's foreign assets, secured the consent of the creditors, who held them, to dispose of them in accordance with the executor's orders and directions; and by reason of its diligence, care and skill, these assets netted the estate a profit in excess of $47,000. * * * These facts seem to us to dispose of the contention that the executor exercised no control over these assets."

Over the widow's objection, the executor was awarded commissions accordingly.

In the *Bolles Case* (67 Misc. 40) the testator's securities were found at his death to be on pledge at a bank to secure a loan. It was also ascertained that his stockbroker, on their margin account, was obligated to deliver to testator a given number of certain securities, and was " holding " these for testator's account. In form, the reverse of our present case occurred; but the difference is immaterial. In our case, the executors sold for the pledgees; but in the *Bolles* case, the pledgees sold for and under the direction of the executors, and turned the net proceeds over to them. On these facts the surrogate said: " The pledgees made these sales not in the exercise of the right of disposition secured to them by the contract of pledge, but solely as the agents of the executors; and their custody of the proceeds at the moment of their application to the debts, respectively, was the possession of their principals." So, it was suggested on the argument herein, the pledgor having died after having granted the stock powers attached to the collateral notes, the better course for the pledgees was to co-operate with or yield to the executor. In so far as this *Bolles* case relates to securities pledged to the banks, its authority has not been limited by the ruling in the *Mercantile Trust Co. Case* (210 N. Y. 83), which relates solely to stocks said to be " held " by a stockbroker for a margin account.

In the case at bar the corporation as pledgee, upon the death of the pledgor, subordinated its rights as pledgee to its duty as executor of the pledgor; and then pursuant the agreement with the family and legatees through their attorney, the executor proceeded to cull the whole of testator's securities; and from the proceeds of the sale of what had thus been selected, both from the pledged and also from the unpledged securities, the executor paid off the notes, and left the estate in possession of all of its better securities, free and clear from the lien of the pledge and from the uncertainty of the market.

This was the object to be attained which, at the outset, the attorney for the family outlined in his reply to the letter sent him from the trust officer of the executor. This object the executor accomplished just as if there had been no pledge. This was handling that was not only actual, but also advantageous to the estate as a whole. Having thus creditably discharged what was peculiarly an executor's duty, it should receive an executor's recompense. The parties in interest, having from the outset sanctioned that particular course of management, are not now in position to urge that the executor as such had nothing to do with the pledged securities.

In the face of the manifest benefits deriving from the threshold agreement made with the parties in interest, no claim is, or could successfully be made that the shift of the pledged securities from the banking department of this corporation over to its trust department was a mere technical ruse to seize an unearned commission. In the peculiar circumstances of this particular case, it seems to me to be immaterial that one and the same corporation, after having received by testator's notes the rights of a pledgee, later on qualified as his executor under special nomination by him in his last will, and acted more in the latter than in the former capacity in liquidating the collateral. Its action, under the agreement, as regards the pledged securities, was wholly executorial, and should be recompensed as such.

Enter the decree in accord with this decision.