In the Matter of the Estate of JULIA E. T. NEWTON, Deceased.

Surrogate's Court, Monroe County, July 24, 1933.

*C. W. McKay*, executor and trustee, in person.

*C. F. W. Kaelber*, for the residuary legatee.

*F. S. Macomber*, for the residuary legatee.

*Hubbell, Taylor, Goodwin, Nixon & Hargrave* [*A. W. Dunbar* of counsel], for the estate of deceased life tenant.

FEELY, S.   Upon the death of the life beneficiary of the two trusts under the will of this testatrix the executor and trustee now accounts for his transactions as such since 1928, leaving nothing but the general legacies outstanding and abiding an agreement as to the settlement of the estate.

One trust was created under the fourth paragraph of the will, whereby testatrix gave to her executor and trustee, in trust, all the Kodak (common) stock she might own at the time of her death, to " pay the income " therefrom to her sister for the life of the latter, and upon her death to " pay the principal " over to the beneficiary's two children.   These two persons have just become the owners of this particular residue, worth about $90,000, as well as the owners of the general residue of the estate, subject to the payment of the general legacies.   The whole estate was taxed at $169,201.

The second trust was on this general residue of the estate, to " pay the income " to the same life beneficiary, and on her death to " pay the principal " residue to the two persons above mentioned, with certain alternative provisos that now are important only as disclosing in outline the task testatrix imposed on her trustee.

The accounting party is confronted with three objections — that he has no right to commissions on the " principal " of the first trust on the common stock of the Kodak company; that a prior decree bars any allowance to him now for his legal services; and that he has no cause of action against the estate of the life tenant for the latter's defaults.   As to the last, the facts are that for some years before her death, the life beneficiary chose to go into actual occupancy of the real estate, instead of receiving the net income therefrom, under the second trust.   During the period of her actual occupancy, the beneficiary paid out of her own pocket, as any life tenant ordinarily would, the current taxes thereon, with the exception of the last few levies or installments, amounting to $695.78.   For these defaults, it seems to me, her estate is now liable to the executor and trustee (See *Keeley* v. *Clark*, 125 Misc. 541); and likewise for a fire insurance premium of $25 that the life tenant should have paid also.   The trustee is entitled to protection against any future liability therefor.   The

trustee seeks also to hold one of the residuaries therefor, a son of the beneficiary, who lived in this house with her; but I am unable to see how this claim could be legally sustained by the executor and trustee as against this remainderman, on the facts herein.

Next, it is urged that no allowance can be made to the trustee herein for such of his service, as a lawyer, as was rendered to the trust estate and in accounting therefor, on the special ground that he was precluded by an agreement as to his legal services, made in January, 1932, in connection with the entry of a decree of intermediate judicial settlement of this whole estate that came to be entered in July, 1932, after considerable negotiation had resulted in the trust estate loaning the general estate enough cash to finance that proceeding, in order to avoid selling the stock of the American Telegraph and Telephone Company for three years. The account sets out that, above the $500 already paid for probate, etc., there had been paid the balance of $3,535 for " attorney fees for entire work on estate;" against which $2,000 had been drawn, leaving $1,535 in the special deposit which had been opened to obtain credit for the gross amount on the Federal tax. The final agreement, however, split the $1,535 by allowing only $1,035 to be paid on the entry of the impending decree of July, 1932, and by deferring payment of the $500 until the time of the final accounting. The decree contains a clear order to that effect. The trustee now claims the $4,000 was to pay for his legal service, both as executor and trustee, but only up to and including the then pending settlement ending in the decree of July, 1932. The comparative difference in recollection presents a very difficult problem. I prefer to say that, in the circumstances, the language of the decree should be read to bar the trustee's claim for legal service on this accounting or to the trust estate.

Lastly, as to commissions — the objectants' admission that the trustee rightfully retained commissions for paying out the " income " received from what the testatrix named the " principal " of the trust she initiated on the Kodak common stock — whereas they object only to his having commissions on the " principal," as if the accessory did not partake and follow the nature of its principal — seems to increase the confusion, as I see it, besetting the ground on which they seek to deprive the trustee of commissions on the " principal," by resort to the rule that there can be no commissions on a " specific " legacy. One must ask, then, whether this term should be detached from its context and history, and be applied literally to these facts, so as to require this court to say to the trustee that for all his four years of care and effort with this fund

of some ninety thousand dollars, intrusted to his stewardship for a lifetime, that he is now only to " have his pains for his labor." One would be slow to say that to a mere messenger boy, and much more so to a " long-haul " trustee; for the testatrix must have meant her attorney, acting as her trustee, should be fully paid for the responsibility she placed upon him by this last will. By it, in brief, she provided that all the Kodak common stock she might own at the time of her death was intrusted to him, to " pay the income " thereof to her sister for the latter's life; and on her death the " principal " was to be " paid " equally to a nephew and to a grandniece; but if either died before testatrix or before the life beneficiary, then the nephew's share of the " principal " was to be paid to his children, or the survivor of them; and the grand-niece's share of the " principal " was to be " paid " to her children, if any; but if she died without issue, in either of the periods afore-said, then to her mother. Nothing having been said about the predecease of the mother, and the general residue having been framed similarly, and testatrix having died without descendants, there was also the possibility of remote collaterals inheriting. It was impossible for the testatrix to have foreseen in what form, or in what amount, just who would partake of this " principal " under that complex plan for its life-long carriage, through the economic vicissitudes of the future, upon the ultimate division either of this common stock or of its equivalent, if meantime the primary duty of preservation dictated its conversion into some safer form; for the unforeseen, in the shape of the World War, and later, of the world-wide depression, forced many trustees, for safety, to deviate even from mandatory directions as to the form of their trust investments. During the war the action of trustees was com-mended as being not only prudent but also patriotic, when they turned their " principal " over into three and one-half per cent First Liberty bonds, in the face of a direction in the will they should not invest in anything but such railroad bonds as yielded four per cent (*Matter of London*, 104 Misc. 372; affd., 187 App. Div. 952); and during the depression the ruling was made that even though the will authorized the continuance of " non-legal " invest-ments, this did not free the trustees from the exercise of vigilance and alert judgment. (*Matter of Clark*, 257 N. Y. 132.) What a farce it would be if this trustee, at the end of the " long-haul," could legally hand over to the remaindermen the original stock certificates themselves, supposing for the sake of the argument they were then worthless, and palliate the loss by the excuse that they were, nevertheless, the self-same certificates the testatrix specified

in her will for him to take over as her trustee and carry for the benefit of the remaindermen. These beneficiaries might well rejoin: " Yes, but where is the ' principal ' she also spoke about in that same paragraph of her will? Just because she started you out with Kodak common was no reason to infer you should never change it over. She did not forbid you to change it; nor did she bid you deliver it in kind to us."

The testatrix must have known that the responsibility she placed upon her trustee was enormously greater than is that of a mere messenger boy to pick up here a package of trifling value, and forthwith deliver it there to a definite person. This trustee's responsibility was first to find this stock and obtain possession of it; then of having it taxed and transferred to the name of the trustee as such; of ever safe-keeping, not merely the stock certificates, but also the " principal " or value thereby symbolized, and of preserving that value through the years of suspension; of ascertaining whether it be needed to supply a lack of general assets, at any time; and of deciding whether its preservation called for its conversion, from time to time, in the economic changes likely to occur in the course of the long haul of the lifetime of the beneficiary; and finally, the responsibility of ascertaining who are, in fact, the proper recipients of it; and then of " paying " it over to them in the proper proportion, and filing their quittances to relieve his bond, taken in the sum of $170,000.

Trustee service was, for a time, regarded in England as an office of friendship, or neighborly courtesy that one landed gentleman might be expected to render to the bereaved family of another; but their old Chancery practice, not to make any award therefor, was early found to be ill adapted to our new and uncultivated Colonial conditions; and accordingly, it was enacted in our Laws of 1817 (Chap. 251) that it be lawful for our Court of Chancery, in the settlement of the accounts of guardians, executors or administrators (trustees are not mentioned), to make a reasonable allowance to them for their services as such, over and above their expenses, the rate of such allowance to be settled by the chancellor. (See *Green* v. *Sanders*, 18 Hun, 308.)

Public opinion thus placed the right to commissions on the basis of *quantum meruit;* and on that basis it will be found to stand today in every State of the Union. The failure to mention trustees in 1817 reflects the infrequency of trusts in those days, when our wealth lay in land rather than in monetary symbols. The chancellor then proceeded to continue a practice, which he himself had already initiated, of compensating the reasonable value by a percentage method. (*Collier* v. *Munn*, 41 N. Y. 143.) Although

this method, by its form, tended to prescind from considering the actual work done in a particular case, its adoption did not remove the matter from the basis of *quantum meruit* in all cases, nor make it a wholly statutory matter in any case. The chancellor's percentages were, within the next decade, embodied in the Revised Statutes of 1829 (2 R. S. 93, § 58), by which our surrogate practice was governed during the ensuing eighty-five years, until the great revision of 1914. This original enactment was that on the settlement of the account of executors or administrators the surrogate should allow to them for their services, over and above their expenses, " for receiving and paying out all *sums of money* not exceeding " certain amounts, a fixed percentage thereof if the will had not provided " for specific compensation " to the executor, in which case he was obliged by section 59 to " renounce all claim to such *specific legacy*." This last term, being ambiguous, was replaced in the Codes by repetition of the term " compensation;" but the original recurred in the 1914 revision in a somewhat different context, hereinafter mentioned.

The words, " sums of money," fell under the literalistic manner of reading that blighted and retarded the betterment of surrogate practice for nearly a century. The same narrow attitude was taken and maintained toward wills and the Statute of Wills. The surrogate in 1829 was little more than a conservator and auditor; and the disposition was to keep him so, rather than enlarge his powers. So, the enacting and the construing of laws touching him, through the last century were characterized by this retarding narrowness, down almost to the recent burst into the efficiency of modern equity powers in this field. While that legalistic spirit held sway, it is not surprising to read of the court solemnly declaring that perfectly good " bonds " were not " money." (*Hall* v. *Tryon*, 1 Dem. 296.) In that case an executor was denied recompense for receiving and delivering unsold bonds; for the reason that they had to be delivered " as bonds," and not " as money; " yet the court there also ruled the executor could have commissions on the interest he had collected on those same bonds; and the court also concedes the rule to be that he could have had commissions on the value of the bonds themselves had the general legatees agreed to take them over as cash. (See, also, *Matter of Brewis*, 165 N. Y. Supp. 1066.) Apparently, the " bonds," for commission purposes, were but scraps of paper; and so it came to pass that any specific thing, other than " money " in the narrowest sense of this word, was not to be considered as a basis for computing commissions; and such was the rule down until the revisers in 1914, by repealing this limitation to " money," destroyed the foundation on which

rested the first denial of commissions on specific legacies. From such literalism alone originated the rule that there can be no commissions on a specific legacy. Nothing whatever in the nature or substantive elements of a specific legacy had anything to do in the making of that rule; nor could it have had, according to the United States Supreme Court. In *West* v. *Smith*, ([1850] 8 How. [U. S.] 402) that court reviewed an "exception * * * that the executor, G., was improperly allowed a commission of $84.29 on a specific legacy of slaves, furniture, &c., made and paid to Sarah H. Hill. * * *

" On general principles, it would seem just and proper for all such (Orphans) courts to make some compensation to executors for such services as paying over legacies, no less than for paying debts. In the case of specific legacies, the trouble and risk are as great, if not greater, than in moneyed legacies; and it would be difficult to find elementary principles to justify commissions in one case and withhold them in the other."

Our highest State court, however, ten years later, felt constrained to cleave to the letter of the law when it ruled tersely in *Schenck* v. *Dart* (22 N. Y. 420) that although shares of stock, specifically bequeathed, had been actually transferred and delivered specifically to the legatees, by the executors, " we think the statute does not justify a commission in such cases (2 R. S. 93, § 58)." Nothing further was said by the Court of Appeals on the specific subject then; nor since, so far as I know.

The literalistic spirit overcarried so far as to deny commissions, in the case of a specific legacy, even where the specific legatee had requested the executor to sell the article and turn the proceeds over to him, which the executor did. (*Farquharson* v. *Nugent*, 6 Dem. 296.) The books abound in like cases — but in none was a trustee's right to commissions involved — and the ruling of the foregoing cases was repeated, without discussion, and as one might say, automatically. As late as 1918 it was held the surrogate has no power to allow an executor commissions on stock specifically bequeathed, even though he has rendered services on it which are reasonably worth the amount of commissions (*Matter of Evans*, 104 Misc. 641); and a like ruling was made later in *Matter of Anable* (139 Misc. 914). In *Matter of Whipple* ([1903] 81 App. Div. 589), in applying the rule that stocks and bonds are not " money," the court admits that stocks, bonds and other securities are usually regarded in the business world as practically the equivalent of money.

In striking contrast to those rulings are the contemporaneous decisions that the legatee, by making such requests on the executor,

becomes personally liable for the reasonable value of such services (*Collier* v. *Munn*, 41 N. Y. 143); and that the standard for measuring the going rate for such like services is the statute on commissions of executors. In *Matter of Oberg* (148 Misc. 400) it was held that such requests may entitle an executor, who was also the pledgee, to commissions on pledged securities. Then there is the other line of contrasting decision that recompenses a temporary or special administrator, collector or conservator as he was called. He, and the committee of a lunatic, for a time, had no statute fixing the amount of his recompense; but he was held to be " within the equity of the statute relating to executors and administrators and entitled to the same fees and commissions (*Green* v. *Sanders*, [1879] 18 Hun, 308.") (*Matter of Ludwig*, 112 Misc. 676). On this theory, he was recompensed, as if he were an executor, but on the basis of the value of the stock and book accounts going to make up the " whole estate "; not simply upon the money actually collected and disbursed, but upon the value of the " whole estate." (*Matter of King*, 122 App. Div. 354.) This parallelism is of interest in so far as it goes along. Thus in *Green* v. *Sanders* (*supra*), in 1879, the court said: " He may have the custody and care of a large amount of securities, or of valuable animals, herds of cattle or the like, for years, without handling any considerable amount of money. The present case illustrates the position. The respondent accounted for property valued at over $104,000. Very little of it was money— over $43,000 was in mortgages, and over $7,000 in stock and cattle on five different farms. The estate was in his hands over two years and a half. We think the proper basis for the allowance of commissions of the special administrator, in this case, is the value of the estate received and passed over by him. As the (lump) sum allowed does not exceed the commissions to which the respondent was entitled on that basis, the error in the form of the allowance worked no harm."

As regards a trustee, the same can be said today. He may find in testator's list, aside from some " cats and dogs," several blocks of stock specifically mentioned; and may have greater trouble in managing them during the lifetime of the beneficiary.

The inequity of asking an executor to do all such work for nothing finally began to break down the former rigid rule. First, where the will worked an equitable conversion of real estate, the executor was given commissions on value thereof, actually handled; and later cases allow a commission in such cases where legatees intervened and changed his course. (See *Oberg Case*, *supra*.) Other cases tend to limit the term " specific legacy " to its original connotation of a gift of a keepsake, entailing little or no duty on the

part of the executor. The complexity of modern life has made it necessary to draw the line between the " messenger boy " case of a single article of little value, given some one as a keepsake, and the case of a long haul trust, involving possible change in the form of investment, owing to the long time the stocks were to be carried and managed, and ultimately to make division among several persons presently unknown, who are, nevertheless, the real beneficiaries, the trustee being merely an agent or intermediary. Surrogate Ketcham remarked that " The only ground for excluding an executor from commissions on a specific gift is that no duty of administration falls upon him with regard to the article bequeathed. It is said that the title to the thing bequeathed vests primarily in the legatee, subject, of course, to the right of the executor to regain it, if it be needed for the payment of debts." (*Matter of Kings Co. Trust Co.*, [*Seton Will*], 69 Misc. 531.)

When a great burden was entailed by specific mention of property, the equity of rewarding the representative became a dominating factor in the decisions. In the *Fisher Case* (93 App. Div. 186) testatrix bequeathed " the contents that shall be in my box in the Safe Deposit Co., of N. Y., now situate at 146 Broadway, N. Y., corner of Liberty St., in said city, at the time of my decease, to the following persons and in the following proportions." Eleven persons were then named to take in unequal fractions, the stocks and bonds, appraised at $101,058.23, contained in the box. This bequest was held to require the conversion of the contents into money before a distribution could be made; and the court said that had the executor refused to make sale of this property and distribute the proceeds as requested, he could have been compelled to perform the same; and for the performance of an executorial act he was entitled to commissions. A case occurred in Monroe county where the will merely devised one particular house and lot to one named legatee and likewise another place to a second; but the draftsman, as usual, forgot to look ahead to this matter of commissions. To have title conveyed to a third person, these legatees finally agreed to pay the executor and trustee commissions thereon if he would qualify as such and pass the title.

In *Matter of Grosvenor* (105 Misc. 344) there was a bequest to two sisters equally of all the furniture, and other specified articles, " and all other personal effects in said house," to be divided in kind, upon appraisal by the executors; and where each legatee desired the same article, the executors could permit them to draw therefor, and make such adjustment as might become necessary as the result of such drawing. Surrogate Fowler there said: " the executors were directed to perform certain executorial func-

tions in connection with them before the specific articles became the individual property of the legatees;" and the executors were held entitled to commissions therefor.

In *Matter of Brooks* ([1922] 119 Misc. 738) there was a bequest of a similar miscellany, equally to such children as survived, and the court, citing *Matter of Fisher* (93 App. Div. 186), said: " the bequest is specific as to the property bequeathed but it was not specific as to the particular property to be delivered to a particular legatee, * * * The division of the property, and its probable sale to effect an equal partition, required the performance of duties by the executors, and they should be allowed commissions on the value of the items so bequeathed."

" Value," as a basis of commissions, found its way into the statute after Judge GRAY had suggested it as a better term than the word " principal," which was the first statutory step away from the phrase " sums of money " in this matter. When the Legislature amended section 3320 of the Code of Civil Procedure, the judge said that " a trustee became * * * entitled to commissions for receiving and paying out all sums of *principal*, * * *

" They were to be no longer fixed by analogy to the rule in the case of an executor, and based upon all *sums of money* received and paid out. The change in phraseology was too deliberate to be disregarded and something different from the existing rule must have been intended. * * *

" Evidently, the Legislature, recognizing the ambiguity in the Code provisions with reference to trustees, intended to establish by the amendment, somewhat inartifically expressed, a rule, which, as I construe it, gives to trustees the right to commissions, in such a case, upon the *value* of the securities, both for receiving them and paying them over." (*Robertson* v. *de Brulatour*, [1907] 188 N. Y. 301, 318.)

Accordingly, in the proposed draft for the 1914 revision, the " value of any real or personal property " was added to " sums of money " as a basis for all representatives, including trustees; but the value was therein limited to such as was " distributed without sale, at the election of a devisee, legatee or distributee, or pursuant to a consent duly filed." A note was added that this was to " give commissions on property turned over in kind, to avoid a sacrifice, etc., when consent is filed. See new §§ 2684, 2736." This new matter ended with the statement: " But this shall not apply in case of a specific legacy or devise." See Report of Commission to Revise the Practice and Procedure in Surrogate's Courts, Senate Document No. 23 [1914; § 2753] p. 283).

Two years later the Legislature amended (Laws of 1916, chap.

596) this addition by omitting the first restrictive clause that had limited the value basis to such property as was accepted in kind; but strangely allowed to remain untouched the second restriction, as to specific legacies. The only thing against giving commissions on such legacies was the literalistic notion that the words " sums of money " were intended to exclude everything else, whether specific or not. It may be doubted whether such had been the real intention of the Revised Statutes. When that literalism was being abolished, no reason remained for denying commissions on the handling in kind of any thing whatsoever. Moreover, there is no reason to infer that the Legislature, in reviving the term " specific legacy " in the statute on commissions, meant to reverse the ruling of the Court of Appeals in *Robertson* v. *de Brulatour*. It seems to me that this part of section 285 of the Surrogate's Court Act should not be extended by construing it so as to perpetuate the really unintended, and the modernly most obnoxious application of the discarded " money " limitation, to specific legacies, in the broadest sense of that term.

However, there is no doubt in my mind that the term " specific legacy " cannot properly be applied to the legacy in trust made by the fourth paragraph of the will now in question. This specifies only the initial existing form of the investment, which it then consistently and repeatedly calls " principal; " and it omits any indication that the testatrix meant that this fund was to retain forever its initial specific form, for delivery in kind to the variously classified remaindermen; but rather this paragraph indicates, not only by the word " principal " but also by the word " trust," with all its necessary implications, that the legacy was liable to be converted, for its own preservation, into some other than its initial form; and this paragraph embodies a far greater responsibility than does the ordinary keepsake gift, so that the testatrix could not have intended such valuable effort should go without its reward. Her intention, at the date of the will, in all the possibilities it outlines, is the factor that governs such matters. (73 A. L. R. 1228, 1252.) I repeat, no case has been found in which commissions were denied a trustee on such a trust as is this; but on the contrary, while the " specific " feature of the legacy in *Robertson* v. *de Brulatour* (188 N. Y. 301) was not therein emphasized, the legacy there given in trust was as " specific " as is the one now in question — that is, in part only. There, a list of specifically described securities is given, in trust, to pay income to widow for life, with remainder over. The will also mentioned, not only the number of shares and the companies, but it included the provision they were to carry into the trust also all the interest accrued thereon " at the

time of my death." This clause implied testator had possession of them at the date of his will; and negatives the idea the executor was to buy such in the market after testator's death. In other words, these two legacies are only " specific " in some features, or in form, not in nature or in substance. In the case cited from the Court of Appeals the will mentioned expressly what is necessarily implied in the word " trust " itself, especially in connection with the word " principal, namely, the power to sell and reinvest," in the absence of some direction to the contrary. This is precisely what takes the case at bar out of the class of legacies where the beneficiary or legatee is intended to receive the thing specified in the specific form it had when it was first specified. Such is the common meaning, if not the exclusive one, of the term " specific legacy." There was no trust in the *Evans Case* (104 Misc. 641), which declared such a simple " specific legacy " was none the less " specific " for that the executor could have, but did not find it necessary to exercise a power of sale for payment of estate expenses or taxes.

In *Matter of Anable* (139 Misc. 914) the gift was specifically to the trustee as such; and as the executor had nothing whatever to do with the subject-matter of it, he could not have executorial commissions on the value of it. This case says nothing as to the trustee's right to trustee commissions.

In the *Terwilliger Case* (142 Misc. 249) also only executorial commissions were passed on. Testatrix there had only a power of appointment under her husband's will; and the property subject thereto, with her own added, was given by her will to her executors in trust to pay over forthwith to three persons named. In so far as the appointed property was concerned, the trust was dry or passive, and vested no trust title in the executors; and did not entitle them to commissions, any more than they would be on a gift of a specific portion of a specific whole.

As to the third objection, therefore, I cannot find any ground, in case law or in statute, for denying this trustee commissions on the " principal " of this trust under the fourth paragraph of this will, notwithstanding the outcome happens to be that the " principal " still remains in the identical form of investment it had at the death of testatrix. The matter must be judged from her point of view then, rather than from our own today.

Enter the decree in accord with this decision, after settlement of its form on two days' notice, or on stipulation.